IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **RICHARD HANSEN,** | ) | **CASE NO. 8:06CV338** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **QWEST COMMUNICATIONS, QWEST** | ) | |
| **BUSINESS RESOURCES, INC., and** | ) | |
| **COMMUNICATIONS WORKERS OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court on cross-motions for summary judgment filed by Defendant Communication Workers of America ("CWA" or the "Union") (Filing No. 65), Plaintiff Richard Hansen (Filing No. 72), and Defendant Qwest Communications ("Qwest") and Qwest Business Resources, Inc. ("BRI") (hereafter collectively referred to as "the Company.") (Filing No. 75). Hansen, an employee of BRI, has filed a hybrid action under Article 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleging that CWA breached its duty of fair representation and the Company breached the collective bargaining agreement in failing to provide him with full back-pay damages following arbitration. The matter was previously before the Court on the Defendants' motions to dismiss, or in the alternative for summary judgment or to stay, which the Court denied. (Filing No. 38). For the reasons provided, the Defendants' motions for summary judgment will be granted.

## FACTUAL BACKGROUND[1]

Discovery is complete, and the material facts remain substantially unchanged from a year ago when the Court addressed the Defendants' motions to dismiss.

BRI discharged Hansen on January 13, 2003. (Filing No. 74, Plaintiff's Index of Evidence at Hansen Dec. ¶4). At that time, Hansen was a member of a bargaining unit covered by a collective bargaining agreement dated August 16, 1998 (the "BRI Agreement"), which remained in force through August 16, 2003. (Hansen Dec. ¶3). On January 20, 2003, Hansen filed a grievance protesting the discharge, and followed the grievance steps outlined in the BRI Agreement. The grievance was rejected at the first two steps; and between the second and third steps the Union representative, Mary Kay Pence, and the Company's representative, Hugh Doherty, engaged in settlement negotiations. The Company offered Hansen $5,000 to settle, without reinstatement. This offer was rejected, and the Union countered on Hansen's behalf, with an offer to settle, without reinstatement, for $50,000. The Company rejected CWA's counter-offer, and denied the grievance at the third stage.

On September 21, 2004, Pence notified Hansen that, based on her belief that the Union could not succeed on the merits of the grievance at arbitration, the Union had decided not to take his grievance to arbitration. (Hansen Dep. Ex. 5). Hansen appealed

---

[1] The facts are taken primarily from the Plaintiff's Statement of Established Material Facts, Filing No. 73, pp. 3-7; to which the Defendants properly responded pursuant to the Court's local rules. (CWA's brief in opposition, Filing No. 86, p. 2; and Qwest BRI's brief in opposition, Filing No. 87, pp. 3-87). Certain documents are cited in the factual background section, and can be found in the record as follows: Filing Nos. 74 and 80 for Hansen Dep. excerpts and exhibits; Filing No. 67 for Christensen Declaration dated September 17, 2007, and exhibits; Filing No. 79 for Doherty Declaration dated September 24, 2007, and exhibits; Filing No.74 for Boyle Declaration dated July 17, 2006 and exhibits; and Filing Nos. 74 and 80 for Boyle Dep. Excerpts.)

Pence's decision to the CWA District 7[2] Vice-President, John Thompson. (Hansen Dep. Ex. 27). LeRoy Christensen, who at the time was Thompson's administrative assistant, evaluated Hansen's appeal. Based on Pence's summary of the grievance, Christensen initially agreed that the grievance should not be sent to arbitration, but asked Pence for the file. Upon review of the file, Christensen reconsidered. Even though he believed that it would be "a difficult case to win," Christensen recommended to Thompson that Hansen's request for an appeal be granted. (Christensen Dec. ¶19).

Before making his recommendation to Thompson, Christensen suggested to Doherty that the Union and the Company use the advisory ADR process outlined in the new collective bargaining agreement, effective in August 2003 (the "Qwest Agreement"). Christensen believed that the process would satisfy Hansen's desire to get the matter resolved sooner than through traditional arbitration, and he also understood that, if the Union prevailed, Hansen would be entitled to 18 months of back pay, which exceeded the amount for which he had been willing to settle. (Christensen Dec. ¶¶20-22).

Under the advisory ADR process, the Union and the Company present the member's grievance to an objective third party, called a "neutral," who renders an advisory opinion. Doherty agreed to use the process, and, in an e-mail to Christensen, confirmed that the advisory ADR process would be pursuant to all the provisions of Article 16 of the Qwest Agreement. Article 16 expressly provides for an 18-month cap on back-pay damages for a prevailing grievant. Christensen and Doherty agreed that either side could reject the advisory opinion and proceed to arbitration. (Christensen Dec. ¶¶ 23-25; Doherty

---

[2] District 7 included CWA members in Nebraska.

3

Dec.¶¶12-16). Thompson agreed to grant Hansen's appeal of Pence's determination, and the grievance was set before the third-party neutral, Mario Bognanno, who was selected from an existing list of arbitrators. (Christensen Dec. ¶ 27).

On November 15, 2004, Christensen spoke briefly with Hansen to inform him that his appeal had been granted and that the Union would take his case to arbitration. There is no dispute that during this conversation Christensen did not notify Hansen that an 18-month cap on back-pay damages would apply. (Hansen Dep. 79; Christensen Dec. ¶ 25). Shortly thereafter, Pence left her position and Union representative Jay Boyle took over the prosecution of Hansen's grievance. (Boyle Dec. ¶¶3-5). Pence told Boyle that Hansen's grievance was to be handled using the advisory ADR process. (Boyle Dec. ¶5). At this time, and for several months thereafter, Boyle did not know that an 18-month cap on back-pay damages would be imposed in the event that Hansen prevailed using the ADR process. In May 2005, Boyle told Hansen that the Company and the Union had agreed to present his grievance to advisory arbitration and explained the procedure. Boyle said that if both sides accepted the advisory decision, it would become final, but that if either side rejected it, that side could demand full arbitration. (Hansen Dec. ¶6).

On September 28, 2005, the parties presented their positions to Bognanno, who determined that there was no just cause for Hansen's firing. His opinion did not address Hansen's remedies. (Hansen Dep. Ex. 2).

On October 12, 2005, Company representative Lesli Bruden informed Boyle via e-mail that the Company had decided to accept the advisory decision rendered by Bognanno, and that Hansen could return to work on October 31, 2005. Boyle telephoned Hansen, either on October 12 or October 13, 2005, and informed him that the Company

4

had accepted the decision and that Hansen would be reinstated on October 31, 2005. Hansen recalls that Boyle stated that he had "checked with his boss" and Hansen was entitled to full back pay under the BRI contract. Boyle testified that he had told Hansen he *would* check with his boss about back pay, although there is no dispute that Boyle then believed that Hansen was likely entitled to full back pay under the BRI contract. (Hansen Dec. ¶ 9; Boyle Dec. ¶ 13, Boyle Dep: 32-36). On October 31, 2005, 33.5 months after Hansen was discharged, Hansen returned to work at the Company. (Hansen Dec. ¶ 10).

On November 1, 2005, Boyle e-mailed a Company representative to inform the Company that Boyle believed Hansen's back pay should be calculated under the BRI contract, which allowed full back pay damages to a prevailing grievant. (Hansen Dep. Ex. 4). The next day, the Company representative responded to Boyle stating that back pay was to be computed for Hansen under the Qwest contract, which limited back-pay damages to 18 months. (Id.) Until this communication, Boyle had no knowledge that the Union had agreed to an 18-month cap. (Boyle Dep. 58). It is likely that about this time, Boyle telephoned Christensen, and, rightly or wrongly, Boyle was left with the impression that all grievances that were pending at the time of the Qwest contract's effective date in August 2003 were subject to the 18-month cap. (Boyle Dep. 34-38). Boyle forwarded to Hansen the Company e-mail, and added the following:

> Attached is the response I received from the company regarding your back pay. What this means is that your pay will be limited to 18 months. I did check the answer out with the District Union office and received this answer, "because at the time we combined BRI into the Qwest Com contract, there was no agreement to arbitrate any termination under the old contract." Meaning at the time all members and grievances migrate to the Qwest / CWA agreement.

5

> I apologize for any confusion as I firmly believed that you fell under the old BRI contract.
>
> As always call if you have questions. Jay.

(Filing No. 74, Dep. Ex. 6).

Hansen called Boyle and asked what agreement governed the arbitration. On November 10, 2005, Boyle sent an e-mail which stated:

> . . . . I believe I already told you and you were present that there was no agreement made from your arbitration other than to return you to work. I am not sure what you are looking for unless it is what the union and the company agreed on as a Make Whole Agreement that has been in place since 1997.

(Hansen Dec. ¶13, Attachment A). Boyle has testified that he did not understand that Christensen had separately negotiated the terms of Hansen's advisory ADR process with Doherty and expressly agreed to the 18-month cap.

Questions of fact that remained following the initial motions have been answered. For example, Hansen testified that he has no evidence that Christensen acted with hostility, ill-will or discriminatory animus toward Hansen. (Hansen Dep. 89-92). Hansen states that he believes Christensen encouraged the use of the advisory ADR process because it was "cheaper and quicker" than traditional arbitration. (Hansen Dep. 94).

Christensen has confirmed through his second affidavit that he had one conversation with Hansen during which he communicated that Hansen's appeal of the Union's decision not to arbitrate was successful, and that he was able to participate in the advisory alternative dispute resolution ("ADR") process which would occur sooner than a full-blown arbitration. Christensen does not recall informing Hansen of the 18-month cap on back-pay damages that would apply if the advisory ADR opinion was accepted, which

6

is consistent with Hansen's testimony. Christensen has also described the information he considered at the time he negotiated the advisory ADR process with the employer's representative, Doherty.

Boyle testified that he did not know CWA's position was that an 18-month back-pay cap applied to Hansen until approximately November 2, 2005, and he did not learn until the latter part of December 2005 that the reason the 18-month cap applied was because Christensen had expressly agreed to it as part of the advisory ADR process for Hansen's grievance. Neither Boyle nor Christensen told Hansen that the 18-month cap was an express term rather than the general approach to all grievances pending before the August 2003 Qwest Agreement became effective. (Boyle Dep. 82). Ultimately, Boyle wrote to Hansen on January 11, 2006, informing Hansen that he still had the right to reject the ADR opinion and to demand full arbitration or accept the reinstatement and 18 months of back pay. In addition, the Union's attorney wrote to Hansen's counsel and explained the nature of the agreement between Christensen and Doherty, and invited Hansen to make his choice. (Boyle Dec. Ex. 6). Because Hansen refused to sign an agreement to accept 18 months of back pay and reinstatement, Boyle notified Qwest that the advisory opinion was being rejected by the Union, and he made a formal demand for traditional arbitration of Hansen's grievance. (Boyle Dec. Ex. 7). Hansen has disavowed that correspondence. It appears that Hansen remains employed at Qwest.

## STANDARD OF REVIEW

### Summary Judgment Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cordry v. Vanderbilt Mortg. & Finance, Inc.,* 445 F.3d 1106, 1109-110 (8th Cir. 2006*) (quoting Bockelman v. MCI Worldcom, Inc.,* 403 F.3d 528, 531 (8th Cir. 2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324-25.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**ANALYSIS**

When the Union and the Company moved to dismiss, or in the alternative for summary judgment, this Court found that because neither the Union nor the Company had rejected Bognanno's advisory opinion, the advisory opinion was transformed by agreement of the parties into the final and binding arbitration decision. No evidence has been presented that alters that conclusion.

8

To prevail in a hybrid action, the employee must first prove the union breached its duty of fair representation. *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 847 (8th Cir. 2006). Hansen's Complaint alleges that CWA breached its duty of fair representation by failing to enforce the arbitrator's decision to obtain full back pay. CWA and the Company argue that Hansen's demand that CWA push for enforcement of a full back-pay award properly was not pursued because CWA, through Christensen, entered into a valid agreement with the Company to pursue the ADR process that expressly included an 18-month cap on back-pay damages in the event the Company was found liable and the advisory opinion was accepted. There is no genuine dispute that Christensen did not inform Hansen, or other Union representatives who communicated with Hansen including Thompson and Boyle, that Christensen had agreed on behalf of CWA that the Company's potential liability for back-pay damages to Hansen would be capped at 18 months if the advisory ADR decision was accepted by them. There is no genuine dispute that Hansen did not know that the Union and his employer had agreed to an 18-month back-pay cap, until November 2, 2005, when Hansen learned of the cap – if not the reason for it – from Boyle.

Whether CWA breached a duty of fair representation to Hansen because it failed timely to disclose the 18-month back-pay cap to Hansen is the only issue that remains.

> A union breaches its duty of fair representation only when its conduct toward a member is "arbitrary, discriminatory, or in bad faith," or so unreasonable as to be "irrational."

*Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 994 (8th Cir. 2006) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967) and *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991)).

9

Hansen has not come forward with evidence to show that Christensen acted fraudulently, or in bad faith or dishonestly, in negotiating the terms of the advisory ADR process with Doherty. There is no evidence of collusion by the Union and employer to deprive Hansen of his rights. The Company had every right to rely upon the CWA's authority to negotiate the terms of the ADR process on behalf of Hansen. Christensen decided to propose the use of the advisory ADR process because he believed that 1) if Qwest agreed to the process, the arbitration would take place sooner, which is something Hansen desired; and 2) Hansen's potential award, even with an 18-month back-pay cap, could be greater than the amount which Hansen had previously said he would take in settlement *without reinstatement*.

CWA and the Company agreed that acceptance of Bognanno's advisory opinion would mean that Hansen was entitled to reinstatement, and he was reinstated on October 31, 2005. CWA and the Company also agreed that acceptance of the opinion meant that Hansen was entitled to 18 months of back pay, and he is. The Company stood ready to pay the 18 months back pay until Hansen objected to its sufficiency.

This Court already has stated that it views Hansen's remedy of back pay as among those "'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge" described in *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562 (1976). The Eighth Circuit Court has stated that the duty of fair representation "may be violated when a union in bad faith or with dishonest purpose interferes with a right conferred on an employee by his employer, fails to take a grievance to arbitration, or waives the provisions of a collective bargaining agreement intended to benefit an employee." *Emmanuel v. Omaha Carpenters Dist. Council*, 535 F.2d 420, 423 (8th Cir.

10

1976). Because the union is the "signatory to the agreement on behalf of all the employees," it serves "in the capacity of a fiduciary to the employees." *Richardson v. Communications Workers of America,* 443 F.2d 974, 980 (8th Cir. 1971). The Eighth Circuit Court stated that a union's conduct may be arbitrary "even though it acted in good faith and without any hostile motive." *Morgan v. St. Joseph Terminal R. Co.*, 815 F.2d 1232, 1234 (8th Cir. 1987) (quoting *Smegal v. Gateway Foods of Minneapolis, Inc.*, 763 F.2d 354, 359 (8th Cir. 1985).

Hansen would have the Court characterize Christensen's failure to communicate the agreement to impose the 18-month cap as arbitrary – if not evidence of bad faith. A union's conduct is arbitrary if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330 (1953). The Eighth Circuit Court has explained that a union breaches its duty of fair representation when it "makes arbitrary decisions as to the merits of an employee's grievance. . . .[A]rbitrary decision-making as to the merits of an employee's grievance may, in some circumstances, be shown where the union ignores the employee's complaint or processes the employee's grievance in a perfunctory manner. A union acts in a perfunctory manner when it acts 'without concern or solicitude' or gives a member's grievance 'only cursory attention.'" *Martin v. American Airlines, Inc.*, 390 F.3d 601, 606-07 (8th Cir. 2004) citations omitted. "[N]egligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." *Buford v. Runyon,* 160 F.3d 1199, 1202 (8th Cir. 1998).

11

I decline Hansen's invitation to read anything more than negligence into Christensen's failure to communicate to Hansen the back-pay cap. In the exercise of due care, Christensen would have ensured that Hansen knew that an 18-month back-pay cap was in play, but the Court finds that his failure to do so is not legally sufficient to show arbitrariness. There is no evidence in the record to suggest that Christensen's silence was anything other than a mistake. Christensen spoke on the phone with Hansen on only one occasion, when Christensen's focus was informing Hansen that his appeal of Pence's decision not to pursue arbitration had been granted, and that Hansen's grievance could be arbitrated sooner by using the advisory ADR process.

No doubt, Christensen and Boyle failed to communicate about the reason for the 18-month cap. There is no dispute that Boyle was left with the impression, from early November 2005 until late December 2005, that back-pay awards were capped at 18 months for those who prevailed on grievances that were pending when the Qwest Agreement became effective. Nevertheless, by November 2, 2005, within a few days of his reinstatement at BRI, Hansen had sufficient information available to him upon which he could have rejected the arbitrator's award and sought full arbitration under the BRI contract. While it may have been a difficult decision, it was not, as characterized by Hansen, a Hobson's choice, because what remained was his right to pursue full back pay as allowed under the BRI contract pursuant to traditional arbitration.

Between November 2005, and January 2006, Hansen negotiated with his Union to obtain its support of his demand for full back pay, but he was unsuccessful. On January 11, 2006, his negotiations with the Union concluded when Boyle communicated the Union's final view: that Hansen's choice was to accept the advisory ADR opinion as the final

decision on his grievance and accept 18 months of back pay, or pursue traditional arbitration. The Union extended the offer to Hansen again in March 2006. The Court finds that Hansen's decision not to pursue traditional arbitration at that time, in the absence of some evidence of bad faith, discrimination, or arbitrariness by the Union, defeats his unfair representation claim.

In the end, Hansen decided to continue working instead of risking his job and his back-pay award by pursuing traditional arbitration. When this fact is considered, along with Hansen's disavowal of CWA's May 26, 2006, letter to the Company demanding traditional arbitration of Hansen's grievance, the Court concludes that enforcement of the advisory ADR opinion as the final resolution of his grievance is the fair and just result.

Viewed in the light most favorable to Hansen, CWA's failure to notify him that an 18-month cap on back-pay damages would be imposed if the advisory ADR opinion was accepted constitutes mere negligence. The Court concludes that CWA's failure to inform Hansen of the negotiated cap on back-pay damages was not such an egregious omission as to amount to a breach of its duty of fair representation. The Court finds that CWA, through Christensen, did not act "so far outside a 'wide range of reasonableness, . . . as to be irrational." (Filing No. 66 p. 16 quoting *O'Neill*, 499 U.S. at 67). There is no evidence that CWA ignored Hansen's grievance or processed it in a perfunctory manner. Hansen has no evidence that Boyle acted with fraud, deceit or dishonesty in connection with Hansen's grievance. Rather, Boyle represented Hansen zealously before the neutral and prevailed.

The Court's decision is consistent with principles supporting federal labor policy. In *Vaca v. Sipes,* the Supreme Court stated:

13

> In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration.  Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. . . .  If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration.  This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

386 U.S. 171, 191-92 (1967). Because there is no evidence to justify setting aside the Union's agreement with the Company to cap back-pay damages as part of its ADR process and the resolution of Hansen's grievance, the Court concludes that there has been no breach of CWA's duty of fair representation, and summary judgment is appropriate on all claims.

## CONCLUSION

I conclude that the advisory ADR opinion was accepted by CWA and the Company and became the binding arbitration decision.  Hansen has failed to come forward with evidence to demonstrate that there is any genuine issue regarding any fact sufficient to set aside the decision.  There is no evidence that the Union negotiated the terms of the advisory ADR process with dishonesty, deceit or bad faith.  There is no evidence that the Union and the employer engaged in collusion against Hansen.  Indeed, Boyle's deposition shows that the Union actively advocated Hansen's position on the grievance.   Further, Hansen was not prejudiced by any action taken by CWA or by the Company.  Hansen decided not to risk what he had already achieved – reinstatement and 18 months of back

pay – for the opportunity to engage in full-blown arbitration with the possibility of gaining additional back pay.

Based on the undisputed facts, the Court concludes that there is no evidence that CWA breached its duty of fair representation to Hansen, and, therefore, there is no evidence to support a breach of the collective bargaining agreement against the Company. Accordingly,

IT IS ORDERED:

1. The advisory opinion of Neutral Mario Bognanno is the final decision on Hansen's grievance because it was accepted by CWA and by Qwest Communications and Qwest Business Resources. Pursuant to CWA's and the Company's agreement, the Company shall pay to Hansen an amount in back-pay damages equal to what Hansen would have earned in 18 months.

2. CWA's Motion for Summary Judgment (Filing No. 65) is granted;

3. The Company's Motion for Summary Judgment (Filing No. 75) is granted;

4. Plaintiff Richard Hansen's Motion for Partial Summary Judgment (Filing No. 72) is denied; and

5. Within five business days, Qwest Communications and Qwest Business Resources, Inc., shall inform the Court what issues, if any, remain for resolution on the Cross-claims. (Filing No. 41).

DATED this 3rd day of December, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge